AO 91 (Rev. 11/82)                           **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>RAFAEL EVERADO SANCHEZ-GARCIA | DOCKET NO.<br><br>MAGISTRATE'S CASE NO. 17MJ03123 |

FILED
CLERK, U.S. DISTRICT COURT

DEC 1 2 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

Complaint for violation of Title 21, United States Code, Sections §§ 841(a)(1), (b)(1)(A)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE CHARLES F. EICK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>July 24, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)]

On or about July 24, 2017, in Los Angeles County, within the Central District of California, defendant RAFAEL EVERADO SANCHEZ-GARCIA knowingly and intentionally possessed with intent to distribute at least 5 kilograms, that is approximately 20 kilograms of a mixture and substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance.

LODGED

2017 DEC 12 AM 9: 5?
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CAL
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing<br>is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MATTHEW PRINCIPE** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE | CHARLES F. EICK | DATE<br>December 12, 2017 |
|---|---|---|

SAUSA Kyle J. Ryan ext. 3159      REC: Detention/Arrest Warrant

KR

**AFFIDAVIT**

I, Matthew Principe, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against RAFAEL EVERADO SANCHEZ-GARCIA ("RAFAEL SANCHEZ") for a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) (Distribution and Possession with Intent to Distribute Controlled Substances).

2.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The property located at 10551 Limonite Avenue, Riverside, California, 91752, (the "SOUTH BOUND EXPRESS PROPERTY").  The property contains a building that consists of bedrooms and a truck yard business, as described more fully in Attachment A-1, which is incorporated by reference.  The business will hereinafter be referred to as "South Bound Express."

b.    The Ford F-150 Truck registered to RAFAEL SANCHEZ with California license plate 7V50356 ("RAFAEL'S TRUCK"), as described more fully in Attachment A-2, which is incorporated by reference.

3.    The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of

the following statutes, as described more fully in Attachment B, which is also incorporated by reference: Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) (Distribution and Possession with Intent to Distribute Controlled Substances), and 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT MATTHEW PRINCIPE

5.    I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code.  I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

6.    I am currently assigned to the DEA Los Angeles Field Division Financial Investigations Group, which investigates large-scale narcotics and money laundering organizations.  I was hired by the DEA in March 2012, and attended the DEA Academy from March 25, 2012 through July 15, 2012.  At the DEA Academy, I was trained in all aspects of drug investigations.

7.    Since becoming a DEA agent, I have received specialized and on-the-job training regarding a variety of criminal activities including money laundering, drug trafficking, and surveillance.  I have participated in criminal investigations involving various crimes, including money laundering and drug trafficking.  Based on my training and experience, I am familiar with the methods drug traffickers use to finance drug transactions and launder drug proceeds.  I am also familiar with the ways in which drug traffickers use digital devices to coordinate, further, and/or conceal their illegal activities.

8.    As a law enforcement officer, I have participated in criminal investigations that have employed a variety of investigative techniques, including electronic surveillance, such as court-authorized interception of wire, oral, and other electronic communications.  I have also conducted telephone toll analysis, undercover operations, physical surveillance, and I have handled and debriefed informants.

3    **Instrumentality Protocol**

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9. From 2013 to present, RAFAEL SANCHEZ and his brother Ernesto Sanchez have been using their trucking business, South Bound Express, to ship kilogram quantities of drugs from the SOUTH BOUND EXPRESS PROPERTY across the country. On or about June 25, 2013, law enforcement executed a state search warrant at the SOUTH BOUND EXPRESS PROPERTY and seized 20 kilograms of cocaine from the building at the SOUTH BOUND EXPRESS PROPERTY. Ernesto Sanchez was arrested and ultimately convicted in connection with this seizure.

10. On or about June 8, 2015, law enforcement in Illinois found 34 kilograms of cocaine in a tractor-trailer driven by a South Bound Express employee who later began working with the DEA as a confidential source ("CS").[1]

11. In June 2017, the CS told the DEA that RAFAEL SANCHEZ had directed the CS to transport 40-50 kilograms from the SOUTH BOUND EXPRESS PROPERTY. On or about July 23, 2017, at the SOUTH BOUND EXPRESS PROPERTY, RAFAEL SANCHEZ gave the CS 20 kilograms

---

[1] The CS is not being paid for his/her work for the DEA and is currently a defendant in a separate case investigated by the DEA. S/He is currently on bail pending further court proceedings. S/He is providing information to law enforcement in order to receive unspecified consideration related to his/her pending case. The CS was previously charged with illegal entry into the United States. S/He was deported from the United States on four occasions in the 1980s. The CS is a naturalized United States citizen. To the best of my knowledge, the CS is reliable.

**Instrumentality Protocol**

of cocaine concealed in boxes of frozen shrimp, loaded in a tractor-trailer.  RAFAEL SANCHEZ told the CS to drive the tractor-trailer with the cocaine to Colorado.  After the CS left the SOUTH BOUND EXPRESS PROPERTY, RAFAEL'S TRUCK also left the SOUTH BOUND EXPRESS PROPERTY.  DEA agents later met with the CS, searched the tractor-trailer, and seized the 20 kilograms of cocaine.

## IV. STATEMENT OF PROBABLE CAUSE

12.  I make this affidavit based upon my training and experience, personal knowledge derived from my participation in this investigation, and information from a variety of sources that I believe to be reliable, including the following:

a.  Oral and written reports and documents about this investigation and other investigations that I have received and reviewed from law enforcement personnel of the DEA and other federal and local law enforcement agencies in the United States;

b.  Discussions I have had concerning this investigation with other federal and local investigators who are participating in this investigation;

c.  Physical surveillance conducted by federal and local law enforcement officers, the results of which have been reported to me either directly or indirectly;

d.  Public records and databases;

e.     Telephone records, information, and telephone subscriber information;

f.     A review of summaries of consensually monitored telephone calls and meetings;

g.     Statements of cooperating sources of information;

h.     Statements and reports made by undercover agents;

i.     A review of electronic surveillance devices such as covert audio surveillance, which has been translated in summary form from Spanish to English by translators.

13.    When I assert that a statement was made or that an event occurred, that information came either from my personal knowledge or from another source of information, including those I have listed above.  Further, based on my training and experience, and the training and experience of other law enforcement officers with whom I am investigating this case, statements that are recounted in this affidavit have frequently been "decoded," meaning that I have provided what I believe to be the intended substance of the statement, even though the language used in the actual statement may have been cryptic or coded in an effort to mask the criminal content of the statement.  Finally, some statements that are recounted in this affidavit may have been originally made in a foreign language. I have provided the English translation, including the decoded substance of the statement.

A.   **Background on South Bound Express and the SOUTH BOUND
     EXPRESS PROPERTY**

14.   I have reviewed California Secretary of State records
from July 2017 regarding South Bound Express.  The records show
that South Bound Express was registered as a transportation
business in the State of California on September 3, 1997, with
an address of 10551 Limonite Ave, Mira Loma, California.  Per
the latest records for South Bound Express, submitted in 2005,
the Chief Executive Officer and Chief Financial Officer were
listed as Ernesto Sanchez, and the Secretary was listed as
RAFAEL SANCHEZ.  Based on my conversation with the CS and open
source information, I understand that Ernesto Sanchez and RAFAEL
SANCHEZ are brothers.

15.   According to California Department of Motor Vehicle
("DMV") records, South Bound Express currently has three semi-
trucks and three trailers registered to the business.

16.   Based on surveillance photographs and my review of
property records, I know that in addition to space for several
semi-trucks and trailers, the SOUTH BOUND EXPRESS PROPERTY
includes a building, specifically, a 1,962 square foot single-
family residence.  The CS told me that he has been inside the
building on the SOUTH BOUND EXPRESS PROPERTY on numerous
occasions.  The CS said that the building is divided into two
sections.  One section contains several bedrooms.  The other

sections contains South Bound Express, including an area where the truck dispatcher sits and works.

17.   RAFAEL SANCHEZ lists the SOUTH BOUND EXPRESS PROPERTY as his address of record with the DMV.  Riverside County property documents show that Ernesto Sanchez and Debbie Sanchez purchased the SOUTH BOUND EXPRESS PROPERTY in January 2006. Open source and law enforcement databases show that Ernesto Sanchez and RAFAEL SANCHEZ received a loan for $400,000 relating to the SOUTH BOUND EXPRESS PROPERTY in January 2016.

**B.    Seizure in 2013 of 20 Kilograms of Cocaine from the Building at the SOUTH BOUND EXPRESS PROPERTY**

18.   I have reviewed law enforcement reports and have learned the following about a cocaine seizure from the SOUTH BOUND EXPRESS PROPERTY in 2013:

a.   On or about June 25, 2013 law enforcement executed a state search warrant at the SOUTH BOUND EXPRESS PROPERTY.  The state search warrant was based, in part, on intercepted telephone communications of Ernesto Sanchez.  Law enforcement found 20 kilograms of cocaine in the building at the SOUTH BOUND EXPRESS PROPERTY.

b.   Ernesto Sanchez was arrested and ultimately convicted and sentenced to two years' imprisonment and 15 years of supervised release.  He was released from custody in or around November 2016.

**Instrumentality Protocol**

C.  **Seizure in 2015 of 34 Kilograms of Cocaine from a Driver for South Bound Express**

19.  Based on my review of law enforcement reports, I learned the following about the seizure of cocaine from a South Bound Express tractor-trailer in 2015:

a.  On or about June 7, 2015, DEA agents and other law enforcement officers followed a South Bound Express tractor-trailer to a truck stop at 3801 North Division Street in Morris, Illinois. The driver of the tractor-trailer later began working with the DEA as a confidential source. Thus, I refer to him/her here as the CS.

b.  On the evening of June 7, 2015, law enforcement saw the CS get picked up by a BMW, dropped off at a motel, picked up again by the same BMW the next morning and taken to his tractor-trailer, and then drive his tractor-trailer in tandem with the BMW. Law enforcement believed that this activity was consistent with a member of the drug trafficking organization checking to see that the drug shipment was secure.

c.  At approximately 5:25 a.m. on or about June 8, 2015, at the direction of the DEA, Illinois State Police ("ISP") Trooper Chad Martinez conducted an investigative stop on the CS's tractor-trailer. During the investigative stop, the CS admitted to ISP Trooper Martinez that he had "a lot" of cocaine inside the cab of the trailer. During a search of the cab, ISP

Trooper Martinez seized 30 rectangular packages in two cardboard boxes. The 30 rectangular packages contained a total of approximately approximately 34.82 kilograms of cocaine.

     d.   The CS was arrested and is currently awaiting trial.

    20.  On or about August 25, 2015, DEA agents interviewed the CS about the events leading up to his arrest on June 8, 2015. From my review of the interview report and my discussions of the interview with other agents, I learned the following:

     a.   The CS said that he was working as a driver for South Bound Express at the time of his arrest. The CS said that South Bound Express was owned and operated by RAFAEL SANCHEZ and Ernesto Sanchez.

     b.   The CS said that he received directions to transport the cocaine from the Los Angeles area to the Chicago area by two older Hispanic males he had seen frequently socializing at the SOUTH BOUND EXPRESS PROPERTY. The CS said he did not know the true identity of the two men but said that they were known as Don Luis and Don Julian. The CS said he believed the two men were close friends or relatives of RAFAEL SANCHEZ and Ernesto Sanchez.

     c.   The CS said that while he was loading the tractor-trailer with legitimate goods at the SOUTH BOUND EXPRESS

PROPERTY, Don Julian met with the CS and gave him two cardboard boxes containing the cocaine packages.

### D.   July 24, 2017 Seizure of 20 Kilograms of Cocaine Received from RAFAEL SANCHEZ at South Bound Express

21.   In or around June 2017, the CS provided the following background regarding RAFAEL SANCHEZ's cocaine distribution through South Bound Express:

a.   RAFAEL SANCHEZ and his brother Ernesto Sanchez routinely send shipments of 20-30 kilograms of cocaine intermingled with legitimate goods to Chicago, Illinois, and other cities in the United States, through their trucking company, South Bound Express.

b.   Once RAFAEL SANCHEZ or Ernesto Sanchez acquired a shipment of cocaine, they would begin to search for shipments of legitimate goods from the SOUTH BOUND EXPRESS PROPERTY that were destined for the cocaine recipient's city, in order to conceal the cocaine in a legitimate shipment from South Bound Express. This process would take approximately one week to coordinate.

c.   The CS said that RAFAEL SANCHEZ and/or Ernesto Sanchez would often wait until late in the evening when the rest of the employees left in order to load the cocaine into the tractor-trailers for transportation at the SOUTH BOUND EXPRESS PROPERTY.

11      **Instrumentality Protocol**

d.    The CS has identified the DMV photograph of RAFAEL SANCHEZ as the person he knew as RAFAEL SANCHEZ, who is the subject of this investigation.

22.  Also in June 2017, the CS told me and other DEA agents that RAFAEL SANCHEZ had recently directed the CS to transport 40-50 kilograms of cocaine.  The CS later reported that during the week of July 17, 2017, the CS had further conversations with RAFAEL SANCHEZ who asked that the CS transport 40-50 kilograms of cocaine to the Denver, Colorado area.  The CS also said that it was possible that RAFAEL SANCHEZ would ask the CS to pick up and return drug proceeds from Denver, Colorado.

23.  The CS said that RAFAEL SANCHEZ used telephone number 951-963-5355 (the "Target Telephone").  On or about July 20, 2017, investigators learned from Sprint that the Target Telephone was a Sprint cellular device subscribed to RAFAEL SANCHEZ with a listed address of P.O. Box 54988, Irvine, CA 92619.  Based on open source checks, I understand that the Target Telephone is the sole listed phone number for South Bound Express.

24.  The CS said that many of the substantive conversations that the CS had with RAFAEL SANCHEZ about transporting cocaine were in person because RAFAEL SANCHEZ was unwilling and hesitant to speak on the telephone.  The CS said that RAFAEL SANCHEZ would call and give the CS a "confirmation number."  According

to the CS, the "confirmation number" was meaningless -- just stating a number via telephone was code that a cocaine shipment was ready; if RAFAEL SANCHEZ did not provide a "confirmation number," the CS knew that the tractor-trailer only contained legitimate goods.

25.    According to the CS, on or about July 21, 2017, during a face-to-face meeting, RAFAEL SANCHEZ told the CS that RAFAEL SANCHEZ would coordinate the receipt of cocaine in the Mira Loma, California area and have the cocaine delivered to his truck yard, South Bound Express.  Then, at an unknown time between 10:00 p.m. and 3:00 a.m., RAFAEL SANCHEZ would load the cocaine in the back of a trailer at the SOUTH BOUND EXPRESS PROPERTY.  The CS said that he understood, from his conversation with RAFAEL SANCHEZ and their past dealings, that the cocaine would be placed in one or two boxes intermingled in the legitimate goods destined for Denver, Colorado.  RAFAEL SANCHEZ told the CS to go to the SOUTH BOUND EXPRESS PROPERTY on July 22, 2017, at approximately 5:00 a.m., and drive the tractor-trailer containing cocaine to "Red Rocks," which the CS understood was code for the Denver area.  After arriving in the Denver area, the CS would be instructed to meet in an unknown location with an unknown individual who would take receipt of the cocaine.  According to the CS, specific instructions would be provided to the CS after arriving in the Denver area.

26.   The CS reported that on or about July 21, 2017, after meeting with RAFAEL SANCHEZ, the CS and RAFAEL SANCHEZ (at the Target Telephone) had several telephonic conversations about the Denver-bound tractor-trailer with 40-50 kilograms of cocaine.[2] According to the CS, during these conversations, RAFAEL SANCHEZ used a fictional confirmation number as coded language to inform the CS that the cocaine would be loaded in the trailer; RAFAEL SANCHEZ told the CS that the trailer was scheduled to be delivered to Denver on July 25, 2017; and Rafael SANCHEZ told the CS to pick up the trailer at the SOUTH BOUND EXPRESS PROPERTY on July 23, 2017.

27.   According to the CS, on or about July 22, 2017, the CS had a subsequent telephonic conversation with RAFAEL SANCHEZ, using the Target Telephone, during which RAFAEL SANCHEZ told the CS to pick up the trailer at approximately 3:00 a.m. on July 23, 2017.  According to the CS, this telephonic conversation occurred at approximately 6:22 p.m.

28.   On or about July 23, 2017, at approximately 2:00 a.m., the CS met with DEA agents who directed the CS to drive to the SOUTH BOUND EXPRESS PROPERTY.  At approximately 2:23 a.m., the

---

[2] The times and dates of all conversations between the CS and RAFAEL SANCHEZ concerning the coordination of the CS's receipt of 20 kilograms of cocaine on or about July 23, 2017 have been verified by investigators via call records and toll analysis of information received from the Sprint Corporation for the Target Telephone.

CS and RAFAEL SANCHEZ had a telephonic conversation concerning the CS's arrival at the SOUTH BOUND EXPRESS PROPERTY. Per the CS, during that telephone call, RAFAEL SANCHEZ told the CS to return to the SOUTH BOUND EXPRESS PROPERTY later during the day on July 23, 2017, as the suspected cocaine was not yet ready to be shipped. According to the CS, RAFAEL SANCHEZ used coded language, specifically, "the load," when discussing the cocaine.

29. Call records show that the CS communicated with the Target Telephone three times from approximately 9:45 a.m. through 11:30 a.m. on July 23, 2017. The CS told me that during those conversations, RAFAEL SANCHEZ used the Target Telephone and instructed the CS to return to the SOUTH BOUND EXPRESS PROPERTY at approximately 10:30 p.m., on July 23, 2017.

30. On July 23, 2017, at approximately 10:00 p.m., the CS met with investigators who provided the CS with an audio recording and transmitting device and directed the CS to drive to the SOUTH BOUND EXPRESS PROPERTY. Shortly after the CS's arrival, RAFAEL SANCHEZ arrived at the SOUTH BOUND EXPRESS PROPERTY. At this time, agents and officers listening to the transmitter worn by the CS could hear the CS and RAFAEL SANCHEZ discussing the placement of packages of cocaine within a tractor-trailer and the logistics of transporting the packages of cocaine to Colorado.

31.   Based on my review of transcribed audio recordings and the CS's observations described to me during the CS's debrief, I know the following about the events of July 23, 2017 at the SOUTH BOUND EXPRESS PROPERTY:

a.   RAFAEL SANCHEZ told the CS the location within the tractor-trailer where the 20 packages of cocaine were to be concealed.  RAFAEL SANCHEZ said that he and the CS would conceal the cocaine within several yellow and white boxes.  These yellow and white boxes would be intermingled with the boxes of legitimate goods, which in this case contained frozen shrimp and seafood.

b.   The CS and RAFAEL SANCHEZ continued discussing where the 20 packages of cocaine would be concealed and details concerning RAFAEL SANCHEZ's receipt of the cocaine.  During the continued conversation, RAFAEL SANCHEZ explained that he had not received the expected 40-50 kilograms of cocaine but rather he had received "20."  RAFAEL SANCHEZ continued to explain that he had received "10" on July 22, 2017, and the remaining "10" at 10:00 a.m. on July 23, 2017.  RAFAEL SANCHEZ explained that he considered sending the original 10 kilograms when he received them but decided to delay the trip to include the additional "10" which he received on July 23, 2017.

c.    RAFAEL SANCHEZ and the CS concealed the 20
packages of cocaine in the two yellow boxes within the tractor-
trailer.

d.    After discussing the quantity of cocaine and
where it would be concealed, RAFAEL SANCHEZ and the CS discussed
details of the trip, including the legitimate goods in the
tractor-trailer, the route, timing, gasoline usage, and the town
in Colorado in which the CS was scheduled to transfer the 20
packages of cocaine to an unknown co-conspirator.

e.    RAFAEL SANCHEZ instructed the CS to use certain
door seals and bills of lading to conceal the cocaine packages
in the tractor-trailer.  RAFAEL SANCHEZ instructed the CS to
reseal the truck doors with seals to conceal the tampering of
the goods.[3]  RAFAEL SANCHEZ further instructed the CS on where to
conceal the bill of lading to avoid detection by law enforcement
personnel.

32.  At approximately 11:50 p.m., on July 23, 2017, I saw a
tractor-trailer, bearing California license plate number
4PL6381, with "SBX – SOUTH BOUND EXPRESS CO" displayed on the
doors of the cab, leave the SOUTH BOUND EXPRESS PROPERTY and

---

[3] Based on my training and experience, I know that metal and
plastic door "seals" are used during truck laden shipping to
ensure goods are not tampered with along a route.  Before the CS
delivered the legitimate goods, the CS would need to break the
original door seal to access the concealed cocaine and transfer
custody of the cocaine to the unknown individual in Colorado.

travel west on Limonite Avenue.  Based on my review of DMV records, I know that the tractor-trailer is registered to South Bound Express, 10551 Limonite Ave, Mira Loma, CA 91752.  The CS was driving the tractor-trailer.

33.  At the same time, I saw RAFAEL'S TRUCK, parked inside the SOUTH BOUND EXPRESS PROPERTY.  I could not see the driver of the Ford.  According to information received from the California DMV, the Ford is registered to RAFAEL SANCHEZ with a listed address of the SOUTH BOUND EXPRESS PROPERTY.  According to the CS, RAFAEL SANCHEZ frequently drives a white Ford King Ranch F-150 pickup – the make and model of RAFAEL'S TRUCK.

34.  At approximately 11:50 p.m., on July 23, 2017, agents and officers terminated surveillance on RAFAEL'S TRUCK and continued to maintain surveillance of the tractor-trailer as the CS drove from the SOUTH BOUND EXPRESS PROPERTY to Interstate 15 northbound.

35.  On July 24, 2017, at approximately 12:05 a.m., after maintaining constant surveillance of the CS, DEA agents, along with Fontana Police Detective Mark Wyrick, met with the CS in a parking lot in Fontana, California.  The CS reported that RAFAEL SANCHEZ hid 20 packages of suspected cocaine in two boxes within the rear compartment of the tractor-trailer.  The CS said that RAFAEL SANCHEZ wore gloves while handling and concealing the packages of cocaine.

**Instrumentality Protocol**

36.   The CS directed SA Russell and myself to a pallet of frozen shrimp boxes within the trailer.  Concealed within two yellow and white boxes of frozen shrimp, SA Russell and I uncovered and seized 20 packages of suspected cocaine.  The suspected cocaine was wrapped in saran wrap and tape.  Three packages were marked with "Viejito," five packages were marked with "TOMMY," and one package was marked with "ROSA."  Agents also searched the cab of the tractor-trailer along with several other pallets of frozen shrimp and did not find any other drugs.

37.   Based on my training and experience, I know that drug traffickers frequently utilize various markings such as "Viejito," "TOMMY," and "ROSA" to identify kilograms of cocaine, destined for different customers.  This method of identification allows drug traffickers to deliver the proper amount of drugs to the appropriate recipients based on directions from management of drug trafficking organizations, often in Mexico or Colombia.

38.   Later in the morning on July 24, 2017, in the presence of TFO Fernando Flores and myself, the CS placed a recorded telephone call to RAFAEL SANCHEZ at the Target Telephone. During the recorded telephone call, the CS told RAFAEL SANCHEZ that the CS was stopped by law enforcement who used a K-9 and seized the "squares."  Based on my training and experience, I know that "squares" is a code word often used to describe kilograms of cocaine due to the typical shape of the packaging.

The CS explained that law enforcement officials released the CS
later that morning. RAFAEL SANCHEZ asked the CS how the law
enforcement officials found the packages. The CS and RAFAEL
SANCHEZ continued discussing the traffic stop until RAFAEL
SANCHEZ instructed the CS to continue driving the truck to
Denver.

39. Investigators gave the CS paperwork from the Fontana
Police Department documenting the seizure of the suspected
cocaine. Investigators instructed the CS to give the paperwork
to RAFAEL SANCHEZ if he requested documentation of the seizure.

40. Following the seizure of the 20 packages of suspected
cocaine, DEA investigators processed the cocaine as evidence and
sent the 20 packages of suspected cocaine to the DEA laboratory
for testing. On or about August 3, 2017, investigators received
laboratory results from the DEA laboratory, which confirmed the
20 packages contained cocaine hydrochloride. The DEA laboratory
also analyzed the packages for fingerprints, which returned
negative results.

41. On or about August 14, 2017, the CS contacted TFO
Flores and me. The CS said that on August 12 and 13, 2017, the
CS received several phone calls from a Spanish speaking
unidentified male ("UM"). After ignoring several phone calls,
the CS answered and was instructed by the UM to fax the police
seizure reports from July 24, 2017 to "the lawyer" at 949-861-

3825.  The UM ignored the CS' requests for the UM's name.  Based on the fax number, DEA agents later identified "the lawyer" as Attorney Kevin Barry McDermott who is licensed to practice law in California, and has an office in Irvine, California.

### V.  TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

42.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug traffickers often store documents and other items relating to the possession, manufacture, importation, exportation, and distribution of drugs and to the illegal proceeds of drug trafficking in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.  These documents and items include invoices, shipping labels, tracking numbers, boxes, and envelopes.

b.  Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.

c.  Drug traffickers attempt to mask the distinct odors of particular drugs through the use of heat sealing and canning devices or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease.  Drug traffickers

also use several packaging layers when shipping drugs to decrease the odor.

d.   Drug traffickers keep books, receipts, notes, ledgers, and other records relating to their drug distribution activities.  Because drug traffickers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.  "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers.  Drug traffickers often keep such records in their residences (even if only intermittently used), stash houses, and cars.

e.   Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs.  When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement. Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking

accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug traffickers often use fictitious or "straw-holder" owners to conceal the true ownership of real estate, cars, or other valuable items purchased with the proceeds of drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities. Drug traffickers often keep these items of value, and records relating to them, in their residences (even if only intermittently used), stash houses, and cars where they are readily available and concealed from law enforcement.

f. Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business. This is to safeguard those items against robbery and keep them hidden from law enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of

items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

g.    Drug traffickers often use USPS or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money throughout the United States.  They do so, at least in part, because of the convenience of the service, the availability of internet and phone tracking services, the speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use handwritten air bills, drop the packages near closing time, pay for such services in cash, and use fictitious names, addresses, and telephone numbers to avoid detection by law enforcement.  Drug traffickers frequently keep records relating to their use of these services, such as receipts, copies of air bills, empty and previously used boxes, packing tape, packaging materials, and package tracking records printed from the internet, in their residences (even if only intermittently used), stash houses, and cars, where they are easily available for reference.

h.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds.  These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  These records are typically maintained in their residences (even if only intermittently used), stash houses, and cars, where they are readily available and concealed from law enforcement.  Moreover, such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices.

        i.    Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.  Documents relating to such travel, such as calendars, travel itineraries, maps, airline tickets, baggage stubs, frequent use club membership information, airline, rental car, and hotel receipts, credit card bills, photographs, videos, passports, and visas, are often kept by drug traffickers in their residences (even if only intermittently used), stash houses, and cars where they are readily available.

j.   Drug traffickers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take such items and harm the drug traffickers during transactions.   Such weapons, which are often stolen or otherwise possessed illegally, are typically kept in their residences (even if only intermittently used), stash houses, and cars where they are concealed from law enforcement and readily available.

k.   Drug traffickers often use two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement. Such items are typically kept in their residences (even if only intermittently used), stash houses, and cars.

l.   Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.   Such items are often stored in their residences (even if only intermittently used) and cars, and on digital devices.

m.   Drug traffickers often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and personal digital

**Instrumentality Protocol**

assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep the documents and records described above on those devices.  Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement.  Drug traffickers often keep these devices in their residences (even if only intermittently used), stash houses, and cars where they are readily available.

### VI. TRAINING AND EXPERTISE RELATED TO DIGITAL DEVICES

43.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

    a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

    b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,

a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

     c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

     d.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[4] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted,

---

[4] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can

record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

      g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.

For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

44.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the

devices, with a fingerprint placed on a fingerprint
sensor.  Each company has a different name for its fingerprint
sensor feature; for example, Apple's is called "Touch ID."  Once
a user has set up the fingerprint sensor feature in the security
settings of the device, the user can unlock the device by
placing a finger or thumb on the device's fingerprint sensor.
If that sensor recognizes the fingerprint or thumbprint, the
device unlocks.  Most devices can be set up to recognize
multiple prints, so that different prints, not necessarily from
the same person, will unlock the device.  In my training and
experience, users of devices with a fingerprint sensor feature
often enable that feature, because it unlocks the phone more
quickly than the entry of a passcode or password but still
offers a layer of security.

     45.  In some circumstances, fingerprint sensors will not
work, and a passcode must be entered to unlock the device.  For
example, with Apple's Touch ID feature, these circumstances
include: (1) when more than 48 hours has passed since the last
time the device was unlocked; and (2) when the device has not
been unlocked via Touch ID in 8 hours and the passcode or
password has not been entered in the last 6 days.  Thus, in the
event law enforcement encounters a locked Apple device, the
opportunity to unlock the device via Touch ID exists only for a
short time.  Touch ID also will not work to unlock the device if

(1) the device has been turned off or restarted; (2) the device
has received a remote lock command; and (3) five unsuccessful
attempts to unlock the device via Touch ID are made.  Other
brands have similar restrictions.  I do not know the passcodes
of the devices likely to be found at the SOUTH BOUND EXPRESS
PROPERTY.

46.  For these reasons, while executing the warrant, agents
will likely need to use the fingerprints or thumbprints of any
user(s) of any fingerprint sensor-enabled device(s) to attempt
to gain access to that device while executing the search
warrant.  The warrant seeks the authority to compel the use of
the fingerprint and/or thumbprint of every person who is located
at the SOUTH BOUND EXPRESS PROPERTY during the execution of the
search and who is reasonably believed by law enforcement to be a
user of a fingerprint sensor-enabled device that is located at
the SOUTH BOUND EXPRESS PROPERTY and falls within the scope of
the warrant.  The government may not be able to obtain the
contents of the devices if those fingerprints are not used to
access the devices by depressing them against the fingerprint
sensor at the time of the search.  Although I do not know which
of the fingers are authorized to access on any given device, I
know based on my training and experience that it is common for
people to use one of their thumbs or index fingers for
fingerprint sensors, and in any event all that would result from

successive failed attempts is the requirement to use the authorized passcode or password.

161. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means, though state wire taps and subpoenas have been obtained that have provided some of the information that will be located on digital devices like cellular telephones. However, most of the information sought will not have been available through the use of wiretaps and the other similar orders that have been authorized during the course of this investigation.

## VII. CONCLUSION

47. For all the reasons described above, there is probable cause to believe that RAFAEL EVERADO SANCHEZ-GARCIA violated Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) (Distribution and Possession with Intent to Distribute Controlled Substances).

48. Furthermore, there is also probable cause to believe that the evidence, fruits, and instrumentalities of the offenses

///

///

///

described in Attachment B will be found at the SOUTH BOUND
EXPRESS PROPERTY, described in Attachment A-1 and RAFAEL'S
TRUCK, described in Attachment A-2.

_____

MATTHEW PRINCIPE
Special Agent,
Drug Enforcement
Administration

Subscribed to and sworn before me
this 12th day of December, 2017.

CHARLES F. EICK
_____
UNITED STATES MAGISTRATE JUDGE